## THE W. A. KIPP.

### THE OVERBROOK.

#### No. A–16927.

District Court, E. D. New York.
July 18, 1945.

730

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelant.

Burlingham, Veeder, Clark & Hupper, of New York City (George R. Wagner, of New York City, of counsel), for claimant.

BYERS, District Judge.

The libelant's wooden coal barge W. A. Kipp (116 feet by 31 feet by 16 feet inside depth) carrying 800 tons of coal, was the outside vessel to starboard in the third tier of a coal tow moored at the end of pier 7 (Manhattan) East River, tailing up river in the flood tide, on the morning of February 9, 1943.

At about 9:00 A. M. she struck pier 9 twice, sustaining damage for which this libel was filed in rem against the steamtug Overbrook, on October 21, 1943. The answer was filed on February 20, 1945.

The reason for this less than punctual course of pleading has not been disclosed, although the evidence contains a statement to her proctors, made by the Overbrook's captain on April 12, 1943, and the libelant first notified the claimant of its grievance on February 18, 1943.

The cause as pleaded is that the Overbrook had landed its tow in the vicinity of pier 6 and that it "became necessary for the Overbrook to swing its tow out into the river * * * and in hauling the tow out the Overbrook caused an excessive strain to be placed on the port hawser of the W. A. Kipp with the result that the starboard stern end of the barge swung toward and collided heavily with the end of pier 9."

The faults specified are: Failure to have a helper tug in maneuvering its tow away from the dock; in maneuvering its tow away from the dock so as to cause excessive strain on the barge's port hawser, breaking it; in so maneuvering with its tow away from the docks (sic) as to cause the Kipp to collide (twice) with the end of pier 9.

The answer denies that on the day in question the Kipp was towed, swung or otherwise moved by the Overbrook, and alleges that any damage sustained by the former was not caused or contributed to by any fault, etc., of the Overbrook.

The libelant has failed to prove its cause as pleaded, and while a different version of the Overbrook's conduct might have supported a recovery, it cannot be said that the evidence as adduced would be sufficient to sustain a decree, even after conforming the pleadings to the proof.

I am satisfied that the Kipp was in the position stated, the tow having been so placed in the early hours of that morning at pier 7, by Pennsylvania tug Baltimore (not the Overbrook). Also that the barge just ahead, the B. B. 146, was taken away at 8:40 A. M. by the Pennsylvania tug Jersey City, causing the bargee of the Kipp to put out a hawser from his port bow corner to the Eddy, the middle barge in the second tier; there were already in place a bow line and a stern line to the Cape Dewey, the barge alongside to port; that is, the middle boat in the third tier.

At about the time that Dehie, the Kipp's bargee, was putting out this hawser from his port bow corner to the Eddy, the Overbrook was removing two barges from the first tier (the middle one and the outside one to port) ahead to pier 6, where presumably she made them fast.

This left but one barge in the head tier, the Sterling, which was the starboard outside barge, the hawser barge, made fast to pier 7, and the rest of the tow was hanging on her; i. e., in Donnelly's phrase (he was the Overbrook's captain): "Yes, the loaded tow was made fast to pier 7, East River."

It must be obvious that the removal of the Sterling was a critical maneuver, since the remaining elements of the tow had to be secured in some manner, or allowed to go adrift, and yet there is not one word of testimony from anyone on the subject of how that movement was handled; it does appear that the Overbrook took the Sterling away, made fast alongside to starboard, and towed her to a Brooklyn pier.

Dehie's version, that the Overbrook took the entire tow out into the river and then

back against so carelessly as to cause the damage stated in the libel, was unconvincing and cannot be relied upon for the following reasons, in addition to his failure to show that he really saw what he said took place:

1. Dehie said the tow was made fast to pier 6, not 7. This is not thought to be correct, since the lcg of the Pennsylvania tug Wicomico, submitted by consent, shows that at 4:40 A. M. on this day she took the barge Hanscome from directly astern of the Kipp in this tow, from pier 7.

The log of the Pennsylvania tug Jersey City shows that at 8:40 A. M. she took the barge B. B. 146 ahead of the Kipp, from pier 6.

The log of the Overbrook shows that at 8:40 she was "Drilling out Boat and making up Tow" at pier 7. Her captain testified as to what movements were comprehended in this entry, as has been above related.

2. Dehie testified that, before the striking at pier 9,·his barge lay about 40 feet from the end of that pier, but this cannot be so, since 750 feet separates piers 6 and 9, and after 4:40 A. M. the tow was but three tiers in length; i. e. about 320 feet, which would put the Kipp about 430 feet from pier 9 at 8:40 A. M., and 270 feet from pier 9, if the tow was made fast to pier 7. The discrepancy is too great to be ignored.

3. Again, Dehie said that he was sure the B. B. 146, the barge just ahead of him, was taken away by a Tracy tug, which is contradicted by the log of the Jersey City. If he cannot be relied upon as to the tug that was operating in his immediate vision, his recital as to events two tiers ahead can scarcely be accepted for present purposes.

4. Finally, he attributes the moving of the entire tow out into the river by the Overbrook from pier 6, to the requirement of a "paper boat" (whatever that may be) which was in the slip alongside of pier 6, upstream, to move out into the river. He could scarcely have observed that while putting out his hawser to the middle barge in the second tier as was rendered necessary by the removal of the B. B. 146 from just ahead of the Kipp. That "paper boat" episode is denied in toto by Donnelly, and

I regard it as a theory evolved by Dehie, rather than an observation.

The proctor for libelant in his written argument says that the tow was either at pier 6 or 7, which is more accommodating than assuring.

It is also true, however, that no ready explanation occurs for the pier discrepancy proclaimed by the logs of the Overbrook and the Jersey City, for at the same time that the former was "Drilling out Boat" (Sterling) at pier 7, the latter was taking out of the tow the second barge astern of the Sterling (the B. B. 146) from pier 6!

While the libel must be dismissed for failure of proof, I should feel free to entertain a motion to reopen, if convincing testimony were proffered, from the Sterling, for instance, or other informed source, as to how the Overbrook actually contrived the removal of that barge and also saw to it, if she did, that the remaining vessels in the tow were handled so as to avoid damage. I think Dehie is probably right in identifying the Overbrook as playing a part in whatever maneuvers were conducted at the time the Sterling was removed from the tow, and in concluding as he doubtless did, that the striking of his barge at the end of pier 9 was related to that movement, or series of movements.

While the cause is in rem against the Overbrook, it is to be remembered that the Kipp was in a Pennsylvania tow, and none but Pennsylvania tugs are shown to have handled any of the barges after the Baltimore hung them on pier 7.

If the wrong tug has been sued, that ends the case; if the right tug has been sued, but the wrong version of her maneuvers has been thus far advanced, and the true facts are available from witnesses who are accessible, and the sum involved is not too trivial to justify further effort, the case could be reopened pursuant to motion on notice, and a later motion to conform the pleadings to the proof could be dealt with in the light of whatever might be developed from such new testimony to be taken at a subsequent hearing.

Settle decree dismissing libel without costs.